FILED
U. S. DISTRICT COURT
DISTRICT OF NEBRASKA

2020 JUL 31  PM 1:31

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No: <u>8:19-CR-28-001</u>: |
| GARY FELLOWS, | ) | |
| Defendant, | ) | <u>Honorable Judge Smith-Camp</u>: |

---

## MOTION TO REDUCE SENTENCE PURSUANT TO
## THE NEW FIRST STEP ACT OF 2018 / U.S.C. §3582(c)(1)(A)
## AS WELL AS SECTION 12003 OF THE NEW CARES ACT OF MARCH 26, 2020:

---

**Comes Now,** Gary Fellows, (hereinafter Defendant), proceeding via pro se representation, hereby respectfully submites this Motion to Reduce [his] Sentence Pursuant to the New First Step Act of 2018, / U.S.C. § 3582(c)(1)(A) As Well As Section 12003 of the New Cares Act of March 26, 2020. Defendant respectfully invokes the legal doctrine of **Haines v. Kerner,** 404 U.S. 519, (1972) in the instant proceedings.

### BACKGROUND:

The Defendant respectfully submits that on 04/09/2019, he entered into a plea agreement and accepted a plea agreement for the violation of; 18:1951 & 2 Hobbs Act Robbery; as well as 18:924(C)(1)(A) & 2 Using Carrying or Possessing a Firearm During and in Relation to a Crime of Violence.

**RECEIVED**

JUL 31 2020

CLERK
U.S. DISTRICT COURT

(-1-)

Defendant was sentenced on 10/07/2019 to a term of 216 months with an additional 3 years of Supervised Release. His tentative release date is scheduled for April 8th, 2040. The Defendant is currently confined in a Medium Security facility located in Pekin, Illinois.

At the time of [his] sentencing, the medical condition of the Defendant may or may not have been known to the Court. Hence, the Defendant suffers from; Hypertension; High Blood Pressure; Under Active Thyroid disease; C.O.P.D.; and is also required to have a Sleep Apnea Machine at night to assist his breathing.

However, due to the Extraordinary and Compelling Reasons herein, (COVID-19) these issues in conjunction with each other were not known to the Court, thereby making statutory allowances for the Defendant to bring this matter before this Court. It should also be noted, that the defendant has lost both of his parents due to similar health issues that run in his family.

Defendant has successfully submitted his initial Compassionate Release request to the Warden of this Institution and received his denial on June 25th, 2020. More than 30 days have now passed in accordance with the statutory provisions of the New First Step Act's requirement which now allow the Defendant to proceed straight to his Sentencing Court. (Please see Exhaustion Issue herein).

## ISSUE ONE:

### Defendant is in the High Risk Category
### For Contracting the COVID-19 Virus:

As noted and addressed within the confines of this motion, is the issue of the Extraordinary and Compelling Reasons, upon which motion is brought before this Court. This surrently being the Corona Virus Pandemic, which has infiltrated numerous Federal Penal Institutions and has infected scores of inmates that are highly susceptible to contracting this disease.

The defendant **did not** have to fear or worry about contracting this virus at the time of his sentencing on October 7, 2019 , because it did not exist as either a National Security Issue or a Global Pandemic at that time. Because it did not exist at the time of Defendants sentencing and was not known to the Court, the Defendant can bring this issue before the Court under the statute of Compassionate Release's Extraordinary and Compelling reasons.

The Center for Disease Control (CDC) has issued it's guidelines, which include a list of Medical issues which place any said particuar person exhibiting or having a history (**past or present**) in a **high risk** category of contracting the COVID-19 virus.

The Defendant happens to be one of those individuals, that due to his medical history places him within this category. The Defendant has a history of: C.O.P.D.; High Blood Pressure; Hypertension; Under Active Thyroid; and is required to use a Sleep Apnea Machine.

(- 3 -)

The Defendant did not come to the Bureau of Prisons with the ex-
pectation of being susceptible to a deadly virus. Despite what the
Bureau may state on their web site, there is no hand sanitizer pro-
vided for; no testing going on gor the general population; (except
in extreme cases) the transfer of inmates into the institution from
unknown areas is still proceeding; Sleep Apnea machines are never
cleaned by Medical staff; Unicor Workers, (over 120 inmates) are not
required to wear their masks, nor are staff that supervise them; This
is simply stated to show the Courts that when the Bureau states that
it is **'taking extreme precautions'** it in fact, is not. There are も も
staff here, that have volunteered to go to other Highly infected
prisons, to do duty, then come back here, and go back onto the com-
pound.

Defendant feels that **numerous Courts** have given susceptible inmates
home confinement, or have reduced their sentences to time served in
order to get them out of the situation of having to risk death in
the Bureau of Prisons. While the recent ruling from the United States
District Courts are too numerous to list, (There are literally hun-
dreds of them) the defendant respectfully asks the Court not to
force him into a situation where should the pandemic reach this In-
stitution, that he is in a position of contracting it and dying.

In short, the Bureau of Prisons, whether through indifference or
incompetence is in fact endangering the lives of individuals en-
trusted to it's care by failing to establish a consistent and effect-
ive safeguards to protect them from the Corona Virus.

## Legal Standard

**In** accordance with the New First Step Act of 2018, 18 U.S.C. § 3582 (c)(1)(A), Defendant submits this motion under the provisions of the "Extraordinary and Compelling Reason's" catch-all provision as per it's definition of the New First Step Act. § 3582(c)(1)(A)(i).

"A motion for modification of a sentence will be made to the sentencing court only in particulary extraordinary **or** compelling circumstances, that could not reasonably have been foreseen by the court at the time of sentencing."

Federal law provides that a court can reduce a term of imprisonment in certain cases. This is found in Title 18 of the United States Code, section 3582(c)(1), commonly known as the Compassionate Release Statute. The New First Step Act, gave inmates the right to petition the courts directly for compassionate release. As a result, the Compassionate Release Statute currently reads;

**(A)** The court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf **or** the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors

.. set forth in section § 3553(a) to the extent that they are applic-
able, if it finds that;

(i) extraordinary and compelling reasons warrant such a reduction;
**or**

(ii) the defendant is at least 70 years of age, has served at least
30 years in prison, pursuant to a sentence imposed under section
3559(c), for the offense or offenses for which the defendant is cur-
rently imprisoned, and a determination has been made by the Director
of the Bureau of Prisons that the defendant is not a danger to the
safety of any other person or the community as provided under section
3142(g); ... and that such a reduction is consistent with applicable
policy statements issued by the Sentencing Commission.

Subsection (a)(1) reads that "extraordinary and compelling reasons
warrant such a reduction;" ... This subsection however, has not been
further defined or explained. This applicable sentencing commission
guideline U.S.S.G. § 1B1.13, has not been updated to provide any fur-
ther guidance.

The United States District Courts have been ruling that there is a
"catch-all provision" providing that there **can be** an "extraordinary
and compelling" reason **other than** medical, age, or family circumstan-
ces. The Courts have determined that they now have a statute that has
not defined or placed any limits on what "extraordinary and compelling
reasons" might warrant a reduction.

**1. Definitions:**

Congress never defined what constitutes "extraordinary and compell-
ing." 28 U.S.C. § 994(t). Instead, the statute directed the Commission
to promulgate "the criteria to be applied and a list of specific"
extraordinary and compelling examples. Id. Before the First Step Act,
the Commission had provided just three such examples, only some of
which may apply here.

The Commission also provided a catch-all provision that allows the
B.O.P. Director to determine "there exists in the defendant's case an
extraordinary and compelling reason other than, or in combination with
the reasons described in subdivisions (A) through (C)." § 1B1.13 cmt.
n.1 (D). That still begs the question: what is extraordinary and com-
pelling?

Congress and the Commission gave two guideposts. Extraordinary and
compelling reasons "need not have been unforeseen at the time of sen-
tencing." **§ 1B1.13 cmt. n.2.** For example, just because a judge believes
a defendant will dramatically improve himself while incarcerated, that
does not mean he / she cannot deem such improvement extraordinary and
compelling. And although "rehabilitation ... is not, by itself, an ex-
traordinary and compelling reason," its mention by the Commission and
Congress indicate rehabilitation may be considered with other factors.
**See, § 1B1.13 cmt. n.3** (emphasis added); **see also § 994(t)** (Rehabilita-
tion of the defendant alone shall not be considered an extraordinary
and compelling reason.").

Courts otherwise are left to themselves because the Commission, for whatever reason, never updated its policy statement, as statutorily required, for the First Step Act. 9  Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons." **§ 1B1.13 cmt. n. 4.** This left district courts in a conundrum. Only on one hand, Congress unequivocally said it wishes to "[i]ncrease the [u]se ... of [c]ompassionate [r]elease" by allowing district courts to grant petitions "consistent with applicable policy statements" from the Commission. § 3582 (c)(1)(A) (emphasis added). On the other hand, the Commission - unable to take any official action, has not made the policy statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassioante release. **See, United States v. Haynes,** 93-CR-1043 (RJD), 2020 WL 1941478, at 14 (E.D.N.Y. Apr. 22, 2020)(citing thirteen such cases): (On just the 924(c) stacking issues).

In the absence of an applicable policy statement, these courts conclude "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § **1B1.13 cmt. n. 1 (A) - (C)** warrant granting relief. **Cantu** 423 F. Supp. 3d 345, 2019 WL 2498923, at 5; see also, **United States v. Fox,** No. 2:14-CR-03-DBH, 2019 WL 3046086, at 3. (D.Me. July 11, 2019)(treating "the previous B.O.P. discretion to identify other extraordinary and compelling reasons as assigned now to the courts").

## THE CENTER FOR DISEASE CONTROL:
## <u>GUIDELINES</u>

In accordance with the (CDC) Center for Disease Control, Compassion-
ate Release people at high risk for severe illness from COVID-19 that
qualify include; but are not limited to: People with chronic lung
disease; moderate to severe asthma; [COPD], and emphysema; People
with serious heart conditions; People with immunocompromised conditions,
including cancer treatment, bone marrow or organ transplantation,
immune deficiencies, poorly controlled HIV or AIDS, and prolonged use
of corticosteroids and other immune weakening medications; People who
are obese (body mass index [BMI] of 40 or higher); People with diabetes;
People with chronic kidney disease (including hepatitis; People with
liver disease; neurologic disorders; neurodevelopmental disorders;
hypertension; high blood pressure; or intellectual disabilities;
pregnancy; current smoking status; former smoking status; or **other
chronic disease's or conditions.**

The Center for Disease Control, which continues to learn more about
COVID-19, that medical conditions which at first were considered as
irrelevant are now considered as a High risk factor, such as hyperten-
sion and obesity. As of April 5th or so, Hypertension and Obesity were
the most common comorbidities seen in patients hospitalized for COVID
19. The study found that 50% of the COVID-19 hospitalizations studied
while 48% had obesity, about 35% reported chronic lung conditions,
such as asthma, and diabetes mellitus and cardiovascular disease were
seen in 28%.

## COVID-19, and the CARES Act:

On Friday, March 26, 2020, President Donald J. Trump signed the
"Coronavirus Aid, Relief, and Economic Security Act" or CARES Act,
into law. The CARES Act authorizes the Attorney General to take seve-
ral actions regarding the prevention of COVID-19 in the Federal Pri-
son system, as well as granting authority to the Attorney General to
take other decisive actions regarding the placement of prisoners into
home confinement.

### THE CARES ACT AS IT RELATES TO FEDERAL PRISONERS:

Section 12003 of the CARES Act states that "The Secretary [of Health
and Human Services] shall appropriately consider, relative to other
priorities of the Department of Health and Human Services for high-risk
and high-need populations, the distribution of infectious disease per-
sonal protective equipment and COVID-19 test kits to the Bureau for
use by inmates and personnel of the Bureau."

Section 12003 goes on to say the following:
**(2) Home Confinement Authority.** During the covered emergency period,
if the Attorney General finds that emergency conditions will material-
ly affect the functioning of the Bureau, the Director of the Bureau
may lengthen the maximum amount of time for which the Director is
authorized to place a prisoner in home confinement under the first
sentence of section **§ 3624(c)(2)** of title 18, United States Code, as
the Director determines appropriate.

## ATTORNEY GENERAL BARR'S RESPONSE TO THE CARES ACT:

Attorney General Barr indicate that the Bureau of Prisons is to con-
sider the totality of circumstances for **each** individual inmate, the
statutory requirements for home confinement and the following non-
exhaustive list of discretionary factors:

* The age and vulnerability of the inmate to COVID-19, in accordance
  with the Centers for Disease Control and Prevention (CDC) Guidelines;

* The security level of the facility currently holding the inmate,
  with priority given to inmates residing in low and minimum-security
  facilities;

* The inmate's conduct in prison, with inmates who have engaged in
  violent or gang related activity in prison or who have incurred a
  BOP violation within the last year, not receiving priority treatment
  under this Memorandum;

* The inmate's score under PATTERN, with inmates who have anything
  above a minimum score not receiving priority treatment under this
  Memorandum;

* Whether the inmate has a demonstrated and verifiable re-entry plan
  that will prevent recidivism and maximize public safety, including
  verification that the conditions under which the inmate would be
  confined upon release would present a lower risk of contracting
  COVID-19 than the inmate would face in his or her BOP facility.

* The inmate's crime of conviction and assessment of the danger posed
  by the inmate to the community. Some offenses, such as sex offenses,
  will render an inmate ineligible for home detention. Other serious
  should weigh more heavily against consideration for home detention.

According to this memorandum, the most qualified candidates are
likely to be older individuals; individuals with co-morbidities, such
as prexisting heart and lung conditions, and other serious health
issues, as defined by the Center for Disease Control. Id.

### Exhaustion Issue:

The first step Act created two ways for a defendant to bring a com-
passionate release motion to a district court. The defendant may file
a motion once he "has fully exhausted all administrative rights to
appeal a failure of the BOP to bring a motion on the defendant's be-
half **or** the lapse of 30 days from the receipt of such a request by
the warden of the defendant's facility. **whichever is earlier.**" 5 §
3582(c)(1)(A)(emphasis added). With this second path, the statute's
plain text states only that thirty days must pass after the defendan-
dant requests compassionate release from the warden. No more, no less.
**United States v. York,** No. 3:11-CR-76, 2019 WL 3241166, at *5 (E.D. Tenn,
July 18, 2019). The statute's text does not place a time limit on the
Defendant's ability to sue, nor does it state that the reasons present-
ed to the warden must mirror those presented to the district court.
See id. at *6 (noting that "[n]othing in the amended language of § 3582
(c)(1)(A) indicates that a defendant is required to file a new admini-
strative request" following the First Step Act's passage).

The Government **should concede** that 30 days have passed since the de-
fendant filed a petition for compassionate release with his warden. It
has already been presented that a defendant does not have to present
or raise all of his reasons supporting compassionate release with his
warden before presenting them here.

Requiring Defendant to raise arguments during administrative pro-
ceedings first would constitute an "issue exhaustion" requirement.

See **Etchu-Njang v. Gonzales,** 403 F.3d 577, 581 (8th Cir. 2005)
(citing **Sims v. Apfel,** 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d
80 (2000)). But the Supreme Court has warned against "reflexively"
applying issue exhaustion to judicial review of any agency decision.
**Sims,** 530 U.S. at 110. Rather, "[t]he desirability of a court imposing
a requirement of issue exhaustion depends on the degree to which the
analogy to normal adversarial litigation applies in a particular ad-
ministrative proceeding." Id. at 109. The more an administrative pro-
ceeding looks like that of an Article III court, the more likely a
litigant must first raise the issue below. Id. at 110. By contrast,
barring unambiguous statutory text to the contrary, 6 issue exhaustion
is inappropriate when the proceedings are more inquisitive than adver-
sarial. Id.; see also **Etchu-Njang,** 403 F.3d at 583. Thus the Supreme
Court has held that an issue exhaustion requirement is inappropriate
when reviewing Social Security proceedings, where both parties to the
dispute lack representation and the decider-an administrative law
judge has the duty to investigate the facts and develop the arguments
for and against relief. **Sims,** 530 U.S. at 110-11.

Here, issue exhaustion is inappropriate **because** § 3582 contains **no
such requirement** and the B.O.P. compassionate release requests are not
adversarial proceedings. Indeed, there are no proceedings. Rather, a
prisoner makes a request, and the Warden decides whether to release
the prisoner. The Warden marshals the facts and weighs each side.

Federal prosecutors and the prisoner do not have representatives or make arguments. The warden may not even respond personally to the prisoner's request, and just may make a "computerized form" response, to cover all such prisoner's requests. Such a process more closely resembles the inquisitive Social Security proceedings in **Sims**, than the adversarial proceedings before this court. Thus, precedent dictates it is inappropriate to require issue exhaustion. Defendant may raise new issues or arguments, including a sudden global pandemic, in his motion to this court.

### Arguments;

### Conditions at F.C.I. Pekin:

While there have not been many cases of COVID-19 discovered at
Pekin F.C.I., the conditions are ripe for the exposure of this virus.
While the Warden has implemented "Modified Operations" this primarily
has just restricted visitation from famil, friends, and attorneys.

It is now a known fact that asymptomatic individuals (those that
carry the virus, but do not themselves show signs of the virus); can
easily transmit the virus to others. This is the same, when this com-
pond comes down with a "bad cold"; within a week or two, 5 out of 10
inmates have caught it, and it is brought into the institution from
staff members. This means that one of the largest risks inmates face,
is that they come into contact with staff members. Correctional offi-
cers, Case Managers, Counselors, etc.

Here at Pekin, staff not only congregate in groups larger than 10,
but are not required to wear their masks, when doing so. This is per-
haps due to their Union: AFGE. Pekin F.C.I. also has a Unicor facili-
ty, that ironically manufactures masks for the military, and yet there
are over some 120 inmates working within a closed confined area, that
**are not required to wear their masks. Nor,** are the staff that oversee
them. There is also the influx of inmates still being transferred into
Pekin F.C.I., and while inmates were initially told that wasn't happ-
ening anymore, it has continued. Inmates have also not been tested
within the units for COVID-19. It is only a matter of time.

## **Arguments:**

As of June 21, 2020, active inmate COVID-19 cases increased 9% to 1,351. There have been some **88 deaths of inmates** within the B.O.P. due solely to the COVID-19 virus. There has also been a 9% increase (as of June 21, 2020) in facilities reporting active Corona virus cases, from **64** to **70** prisons. Out of nearly 19,000 inmate COVID-19 test's that the B.O.P. has actually tested, one inmate out of three have tested positive.**f1** The B.O.P.'s own test numbers reflect that 86% of all federal inmates have yet to be tested.

A June 18, 2020 **MArshall Project/VICE News**f2 collaboration blasted the B.O.P.'s management of the pandemic. Based on over 100 interviews and reviews of dozens of internal B.O.P. memos, emails, and other documents, the story reported that "staff ignored or minimized prisoner's COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines"; thousands of prisoners being transferred around the country in February and earl March transmitted the pandemic from prison to prison, according to BOP records; BOP staff felt pressured to report to work after being exposed to sick prisoners; the BOP failed to follow its own pandemic response plan by spacing out prisoners; the agency deliberately limited testing so that it would not have to report positive cases. Prisoner quarantines were set up in "filthy building that had been vacant for years or in tents that flooded during rainstorms.

Numerous Courts have been granting an expotential amount of inmate compassionate releases, due to the risk factor that the CDC has listed. Of which this defendant has the symptoms indicated. Gathering information about the COVID-19 pandemic within the BOP is extremely difficult, except in cases where the BOP decides to release it's own version.

The number of cases reported at FCI Pekin has a very limited probative value in predicting the chance of a particualr inmate or inmates exposure to the virus. primarily because very limited testing is currently taking place at F.C.I. Pekin. cf. **Wilson v. Williams,** [f3] 2020 WL 2542131 at 12. (N.D. Ohio, May 19, 2020) discussing disparities between BOP related COVID-19 prevalance data for a facility and the results of Court ordered testing at the facility.

---

**f3.** There is some reason to be concerned about the BOP's response to the COVID 19 outbreak. A federal Judge recently found that the BOP made "minimal effort" to comply with a preliminary injunction requiring it to implement the testing and transfer or prisoners out of a low security facility in which a COVID-19 outbreak was ongoing. See, **Wilson,** 2020 WL 2542131 at 12.

**f2.** The Marshall Project: "I begged Them To Let Me Die"; How Federal Prisons Became Coronavirus Death Traps, (June 18, 2020)

**f1.** ABC, More than 1 out of 3 tested Federal Inmates were positive for Coronavirus: (June 16, 2020).

## RELIEF REQUESTED:

**Whereas,** at the time of the preparation of this motion, the latest COVID statistics that were available to the Defendant were as of (**July 5th, 2020**) the number of COVID-19 cases had affected **70** different Federal facilities. The number of inmate deaths have since risen to **92 fatalities** The outbreaks continue in Oakdale, a previous flashpoint, which is being locked down again, but have also hit women's facilities hard, including Coleman, **Pekin**, Carswell, and Waseca, among others. **Pekin** women's facility is a mere 50 yards away from this Medium security facility. The risk of cross contamination is significantly much higher now, as not only do B.O.P. staff come and go between the two facilities, but when this institution goes on a "lockdown" situation, it is the women who prepare our meals.

The defendant respectfully stresses to this Honorable Court that COVID-19 was not present as a National Security issue at the time of the defendant's sentencing. He therefore asks, that due to the medical issues that he has, it has placed him within the **high risk category** of contracting Covid-19 and that he has an inherent right to safeguard his own health, life and safety, of which he cannot be guaranteed will happen within the confines of the Bureau of Prisons, no matter what they may claim. Congress is even aware of the total mis-management of the Bureau's response and handling of this virus pandemic.

**Therefore,** defendant respectfully requests that this Court make a reduction in his sentence, and either grant him immediate release to be placed upon home confinement; until this Court deems otherwise, or allow him to immediate release to pursue his proposed release plans, in a safe and healthy enviroment.

Respectfully Submitted,

Gary Fellows # 14569-047
F.C.I. Pekin
Post Office Box 5000
Pekin, Ill. 61555-5000

## CERTIFICATE OF SERVICE:

That I, Gary Fellows,   do hereby attest and swear under the penalty of perjury, that on the 27 of July , 2020, I placed the aforegoing motion for Reduction of Sentence Pursuant to the New First Step Act of 2018 18 U.S.C. § 3582(c)(1)(A), as well as Section 12003 of the New Cares Act of March, 26th, 2020, by placing same in a First Class envelope and using the legal mail system here at F.C.I. Pekin, Pekin, Illinois did so mail it to the address listed below.

Signed and Attested to by:

Gary Fellows # 14569-047

Mailed to:   Clerk of the U.S. District Court
             593 Federal Bldg.
             100 Centennial Mall North
             Lincoln, Nebraska  68508-3803

(- 19 -)



RESPONSE TO INMATE REQUEST TO STAFF MEMBER
FELLOWS, Gary
Reg. No. 14569-047

You requested a reduction in sentence (RIS) based on concerns about COVID-19.
After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on
motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or
compelling reasons.   BOP Program Statement No. 5050.50, Compassionate
Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§
3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present
extraordinary or compelling reasons, such as the inmate's terminal medical condition;
debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with
medical conditions, or an "other elderly inmate"; the death or incapacitation of the family
member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or
registered partner.   Your request has been evaluated consistent with this general
guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat
any affected inmates.   We recognize that you, like all of us, have legitimate concerns
and fears about the spread and effects of the virus.   However, your concern about being
potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an
early release from your sentence.   Accordingly, your RIS request is denied at this time.

If you are not satisfied with this response to your request, you may commence an appeal
of this decision via the administrative remedy process by submitting your concerns on
the appropriate form (BP-9) within 20 days of the receipt of this response.

_____          6-25-20
F. Entzel, Warden                              Date



Gary Fellows #14569-047
F.C.I. Pekin
Post Office Box 5000
Pekin, ILL. 61555-5000

RECEIVED
JUL 28 2020
FCI PEKIN
MAIL ROOM

RECEIVED
JUL 31 2020
CLERK
U.S. DISTRICT COURT

Clerk of the U.S. District Court
593 Federal Bldg.
100 Centennial Mall North
Lincoln, Nebraska 68508-3803

Legal Mail :

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem. which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

Mail Room
**Federal Correctional Institution**
P. O. Box 7000
Pekin, IL 61555-7000